```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF TEXAS
                     FORT WORTH DIVISION

STATE OF TEXAS, et al.        §
                              §
VS.                           §    ACTION NO. 4:23-CV-66-Y
                              §
UNITED STATES DEPARTMENT      §
OF HEALTH AND HUMAN           §
SERVICES, et al.              §
```

**OPINION AND ORDER GRANTING MOTION TO DISMISS**

Before the Court is a motion to dismiss for lack of jurisdiction (doc. 14) filed by Defendants. For the reasons set forth below, the motion will be granted.

**BACKGROUND**

**I.  The Promulgation of the Contested Regulation**

In 2016, the United States Department of Health and Human Services ("HHS") published a Notice of Proposed Rulemaking (81 FR 53240), seeking to define the term "public health emergency." Because this definition was central to the ability of HHS and the Centers for Disease Control and Prevention ("CDC") to quarantine, isolate, and conditionally release people on an interstate basis during such an event, the agencies claim that it was imperative for the public understand when they possessed such authority.

Therefore, the proposed rule offered five definitions of what could constitute a public health emergency. Subsections one and two define a public health emergency as any communicable disease

event determined by the director of the CDC or the secretary of HHS, respectively. See 42 C.F.R. § 70.1(1), (2). The last three subsections define a public health emergency to include any communicable disease that (1) is notified to the World Health Organization ("WHO"), (2) is determined by the director-general of the WHO, or (3) the director-general of the WHO has issued temporary or standing recommendations for purposes of preventing or promptly detecting the occurrence or reoccurrence of the disease. *Id.* § 70.1(3)-(5).

HHS requested public comment on the proposed definition of a public health emergency. But it later considered and rejected comments expressing concerns that references to WHO relinquished the sovereignty of the United States to a foreign organization. As such, the final rule was published on January 19, 2017. See 82 Fed. Reg. 6905 (Jan. 19, 2017) (codified at 42 C.F.R. pt. 70).

**II.  COVID-19 and Plaintiffs' Petition for Proposed Rulemaking**

In January 2020, the WHO announced that it was investigating a coronavirus-related pneumonia that had emerged in Wuhan, China.[1] Over the following months, COVID-19 spread throughout China and had been transmitted to the United States and across the world. *Id.* Then, in February 2020, the government of the United States

---

[1] AM. J. OF MANAGED CARE, A TIMELINE OF COVID-19 DEVELOPMENTS IN 2020 (Jan. 1, 2021).

declared a public health emergency over the spread of coronavirus throughout the country.

In response to the growing threat of COVID-19, HHS repatriated about 1,000 people who had been in Wuhan, China, or onboard the *Diamond Princess* cruise ship in Yokohama, Japan, and quarantined them in the United States for fourteen days. (Doc. 1-3, at 3.) In addition, HHS quarantined another 2,000 people who were onboard the *Grand Princess* cruise ship in San Francisco, California. (Doc. 1-3, at 4.) In doing so, HHS relied on various regulations for its power to quarantine these individuals, including 42 C.F.R. §§ 70.6, 71.32(a), and 71.33.

Fast forwarding nearly to the end of the pandemic, on July 18, 2022, Oklahoma and Texas ("the States"), along with other states, submitted a petition for proposed rulemaking, requesting the deletion of the three definitions in 42 C.F.R. § 70.1 that mention any WHO involvement in determining whether a public health emergency exists in the United States. (Doc. 1-2.) The petition contained three basic contentions: (1) the definitions were an unlawful delegation of power to an international body; (2) changed circumstances justified the proposed change based on WHO's treatment of the COVID-19 pandemic; and (3) Defendants ("the Government") have denied that they need to use the definitions as written. (Doc. 1-2.)

The Government denied the States' rulemaking petition, claiming that HHS "will continue to make its own independent decisions" when making quarantine determinations. (Doc. 1-3, at 3.) In addition, the Government asserted that it is "important to include references to WHO in the definition of 'public health emergency' to inform the public of the circumstances that HHS and the CDC may consider" in invoking its powers to quarantine, isolate, and conditionally release people. (Doc. 1-3, at 4.)

**III. This Case and its Procedural Posture**

The denial of the States' rulemaking petition prompted their filing of this suit against the Government, in which they argue that the promulgation of the regulation and the subsequent denial of the rulemaking petition violate the Administrative Procedure Act ("APA") and the non-delegation and state-sovereignty principles of the Constitution of the United States. (Doc. 1, at 10–17.) The States seek declaratory and injunctive relief from the Court. (Doc. 1, at 18.) In response, the Government moves to dismiss the States' claims, contending primarily that the Court lacks subject-matter jurisdiction because the States lack standing to sue. (Doc. 14.) The States have responded. (Doc. 22.) And the Government has replied. (Doc. 24.)

The motion is therefore ripe for the Court's review.

**LEGAL STANDARD**

Federal Rule of Civil Procedure 12(b)(1) authorizes dismissal of a suit when the court lacks subject-matter jurisdiction. FED. R. CIV. P. 12(b)(1). Because Article III standing is a central concern regarding the court's subject-matter jurisdiction over an action, it is properly addressed under Rule 12(b)(1). *Lee v. Verizon Commc'ns, Inc.*, 837 F.3d 523, 533 (5th Cir. 2016). The party seeking federal jurisdiction has the burden of establishing standing. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 561 (1992).

**ANALYSIS**

The Government moves to dismiss the States' claims on three grounds: (1) the States lack standing to sue; (2) their claims are unripe; and (3) the agency action did not violate the APA. The Court only addresses standing, believing it to be dispositive of the States' claims.

In its motion, the Government argues that the States lack standing because (1) they do not possess a concrete injury as a result of the challenged regulation, and (2) no form of injunctive relief would redress the States' alleged injuries. (Doc. 15, at 13–14.) The Court agrees that the States lack a concrete injury in fact that is traceable to the challenged definitions.

This case begins and ends with standing. *Carney v. Adams*, 141 S. Ct. 493, 498 (2020). The Constitution of the United States vests

Article III courts with the power to decide only "Cases" or "Controversies." Art. III, § 2. The courts have long understood that constitutional phrase to require that a case embody a genuine, live dispute between adverse parties, thereby preventing the federal courts from issuing advisory opinions. *Carney*, 141 S. Ct. at 498 (referencing *Flast v. Cohen*, 392 U.S. 83, 96–97 (1968)).

Proof of standing must satisfy three requirements. *Lujan*, 504 U.S. at 560. First, a plaintiff must show a concrete injury in fact that is not conjectural or hypothetical.[2] *Whitmore v. Arkansas*, 495 U.S. 149, 149 (1990). Second, the plaintiff must demonstrate causation—a fairly traceable connection between the plaintiff's injury and the complained-of conduct of the defendant. *Simon v. E. Ky. Welfare Rts. Org.*, 426 U.S. 26, 41–42 (1976). Third, the complainant must reveal redressability—a likelihood that the requested relief will redress the alleged injury. *See Lujan*, 504 U.S. at 562. These three requirements constitute the core of Article III's insistence that a case or controversy is necessary to invoke the exercise of judicial power. *See FW/PBS, Inc. v. Dallas*, 493 U.S. 215, 231 (1990). Relaxation of these requirements would directly and unconstitutionally expand the

---

[2] In addition, if a future injury is alleged, then the plaintiff must establish that the threatened injury is imminent. *See Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("although imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes") (citation omitted.)

power of the federal courts. *See Hein v. Freedom from Religion Found., Inc.*, 551 U.S. 587, 611 (2007) (citation omitted.)

In response to the motion, the States aver that they fulfill the three requirements to establish Article III standing, particularly in light of the special solicitude that they receive as state litigants asserting a procedural right. Given the recent tendency of the states of the American union to rely upon the doctrine of special solicitude in support of their claims of standing, the Court will first address the States' assertion of their entitlement to special solicitude here. The Court will then discuss the injury-in-fact requirement and the States' lack of a cognizable injury.

### I. The Special Solicitude for the States in Establishing Standing.

The States contend that they are entitled to special solicitude in the standing analysis because they have a procedural right under the APA to challenge the Government's conduct, and that conduct implicates the States' quasi-sovereign interests in protecting their populaces. (Doc. 22, at 14–15.) The States are correct, but the fulcrum of special solicitude does not produce as much leverage as they contend.

The Supreme Court has made clear that "States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007). States are

"entitled to special solicitude in [the] standing analysis" because they "surrender[ed] certain sovereign prerogatives" when they entered the Union. *Id.* at 519, 520. To establish an entitlement to special solicitude, a state must show that: (1) it has a procedural right to challenge the action; and (2) the challenged action must affect one of the state's quasi-sovereign interests. *See Texas v. United States* (*Texas DACA*), 50 F.4th 498, 514 (5th Cir. 2022). If a state shows that it is entitled to special solicitude, then the standards for redressability and imminence are relaxed. *See Lujan*, 504 U.S. at 572 n.7.

Here, the States do establish an entitlement to special solicitude. First, as states often do under the APA, the States have a procedural right to challenge the Government's denial of their rulemaking petition. *See Texas v. United States* (*DAPA*), 809 F.3d 134, 152 (5th Cir. 2015) (stating "[i]n enacting the APA, Congress intended for those suffering legal wrong because of agency action to have judicial recourse, and the states fall well within that definition") (cleaned up); *see also* 5 U.S.C. § 702. The States satisfy their first qualification for special solicitude.

Second, the denial of the States' petition concerns their quasi-sovereign interests in the health and well-being of their residents because quarantine orders enabled by the challenged regulation burden the residents of all states. The classic example of a quasi-sovereign interest is the state's "interest in the

health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. P.R., ex rel., Barez*, 458 U.S. 592, 602 (1982). The States have a concrete interest in challenging the definition of a public health emergency because, as the Government acknowledges, the definitions "operate as a predicate to action" that involves federal agencies ordering persons to quarantine for a period of time. (Doc. 15, at 15.) This would include residents of the States—thus invoking their quasi-sovereign interests. The second qualification is also met.

While the States have shown themselves entitled to special solicitude in the Court's standing analysis, this deference is not as pronounced as the States believe. In their words, "[s]pecial solicitude relaxes the standing requirements." (Doc. 22, at 13.) While this is a generally correct statement of the law, special solicitude only **eases** the standards for redressability and imminence. *See Lujan*, 504 U.S. at 572 n.7. It does not absolve the States from nonetheless fulfilling the irreducible three elements of standing. *See United States v. Texas*, 143 S. Ct. 1964, 1976 (2023) (Gorsuch, J., concurring) ("[if] a plaintiff fails at any step [in establishing standing], the court cannot reach the merits of the dispute. This is true whether the plaintiff is a private person or a State.") The States must still meet their burden of establishing Article III standing. *See, e.g., Texas v. United*

*States* (*Texas INS Enforcement*), 40 F.4th 205, 216 (5th Cir. 2022); *Texas DACA*, 50 F.4th at 517.

## II. The Injury-in-Fact Requirement

The Government argues that the States fail to establish a concrete injury that is traceable to the challenged regulation. In response, the States contend that they sufficiently pled a future injury in fact—namely, that the challenged definitions will injure their quasi-sovereign interests when a public health emergency is declared in the future based on the three WHO-reliant definitions. The Court disagrees.

To qualify as a sufficient Article III injury, the plaintiff's injury in fact must be "concrete—that is, real, and not abstract" *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)). While future injury can suffice as a cognizable injury under Article III, the "threatened injury must be . . . impending to constitute injury in fact," and "allegations of [a] possible future injury" are not sufficient. *Clapper*, 568 U.S. at 409 (citation omitted.) Again though, this imminence requirement is relaxed because the States are vested with special-solicitude status. *Texas DACA*, 50 F.4th at 216.

But here, the States' alleged injury is insufficient for two reasons. First, the thrust of the States' challenge targets three of the five definitions of a public health emergency that the

Government may rely on to declare such an emergency. (Doc. 1, at 7.) These definitions, without more, give the Government no power to quarantine, isolate, and conditionally release people. *See* 42 C.F.R. § 70.1. But they do allow the Government to declare a public health emergency, which declaration then does invoke the power to quarantine, if that action is necessary. As the parties seem to agree, the definitions, and a declaration of a public health emergency, are simply "predicate[s] to action." Compare doc. 22, at 10–11, with doc. 1-3, at 3.[3] Standing alone, the definitions cause no injury to the States. Therefore, the insult that the States claim to suffer from the three offending definitions, which may or may not be used in the future to declare a public health emergency, is not a concrete injury to their quasi-sovereign interests in the health and well-being of their residents.

Second, even under a relaxed imminence standard, the States' fear that a future pandemic and public health emergency is bound to happen at some point and that the quarantine power, which has been used previously and unquestionably will be used again, fails to establish a "possible future injury." That is because the States

---

[3] The States contend that the three definitions operate as an "automatic trigger" by which WHO can independently determine that a public health emergency exists in the United States. (Doc. 22, at 18.) This is true, and the parties do not dispute that WHO can solely make such a determination. Compare doc. 15, at 15, with doc. 22, at 17. But the invocation of a public health emergency does not automatically trigger interstate quarantine orders or the burdens associated with that power. As the Government points out, other statutes and regulations then provide HHS and the CDC the discretionary authority to act following the declaration of a public health emergency. (Doc. 15, at 17.)

fail to show any reasonable possibility that the Government will (1) declare a public health emergency through any of the three challenged definitions,[4] (2) then invoke the quarantine power solely through the discretionary authority provided to it by that declaration, and (3) infringe on the States' quasi-sovereign interests via the burdens associated with the quarantine power. As the Government points out, it has never relied solely on the challenged definitions in the past to declare a public health emergency, and the States provide no evidence of such a reliance. (Doc. 24, at 5.) The States' alleged injury is simply too speculative for the Court to determine that they establish a sufficient injury in fact.

Therefore, while the States' burden in proving the imminence of the injury is lower due to the special solicitude afforded to them, this lowered burden cannot mean that states establish a future injury if they show any possibility of the injury-causing event's occurring in the future. The States, therefore, fail to establish a cognizable injury in fact.

---

[4] There are traceability concerns here, as well, because the States generally argue that the quarantine power will inevitably be used again by the Government. No reasonable mind would dispute this proposition in the abstract. However, the States dodge the issue that the future use of the quarantine power *must be linked* to the three challenged definitions of a public health emergency. *See Simon*, 426 U.S. at 41–42 ("a federal court can act only to redress injury that fairly can be traced to the challenged action of the defendant.") This is concerning because, even if the Court were to grant to the States' requested relief, their quasi-sovereign interests would still be infringed upon by a later-declared public health emergency and quarantine under the two remaining definitions.

## CONCLUSION

If individuals and groups can invoke the authority of a federal court to forbid what they dislike for no more reason than that they deem it wrongheaded, erroneous, or even potentially injurious, the federal judiciary will exceed its limited constitutional mandate and infringe upon powers committed to other branches of government. *See Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2099 (2019) (Gorsuch, J., concurring). Indeed, by entertaining the doctrine of standing before ever reaching the merits of a case, federal courts "prevent the judicial process from being used to usurp the powers of the political branches." *Clapper*, 568 U.S. at 408. Without reaching any conclusions regarding the propriety of the contested definitions, and for the reasons above, the Court must fulfill its limited constitutional role and determine that the States lack standing. Accordingly, the motion to dismiss (doc. 14) should be, and it is hereby, **GRANTED**. This case is **DISMISSED without prejudice**.[5]

SIGNED August 18, 2023.

_____
TERRY R. MEANS
UNITED STATES DISTRICT JUDGE

---

[5] Because arguing standing via a Rule 12(b)(1) motion goes to the Court's lack of subject-matter jurisdiction, a dismissal of the States' claims without prejudice is appropriate. *See Campos v. United States*, 888 F.3d 724, 738 (5th Cir. 2018) (citing *Cox, Cox, Filo, Camel & Wilson, L.L.C. v. Sasol N. Am., Inc.*, 544 F. App'x 455, 456 (5th Cir. 2013)).